**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRUCE A. VAN BUSKIRK, and LORI A. VAN BUSKIRK <br><br> PLAINTIFFS, <br><br> THE UNITED GROUP OF COMPANIES, INC; DAVIS CAPITAL GROUP, INC; DCG FUNDS MANAGEMENT, LLC; DCG/UGOC FUNDS MANAGEMENT II, LLC; RICHARD W. DAVIS JR; MICHAEL J. UCCELLINI and JESSICA F. STEFFENSEN as Executor and Executrix, Respectively, of the ESTATE OF WALTER F. UCCELLINI; MICHAEL J. UCCELLINI; MCM SECURITIES, LLC; and MILLENNIUM CREDIT MARKETS, LLC <br><br> DEFENDANTS. | Case No.: 1:16-cv-00881-GLS <br><br> **SECOND AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Bruce A. Van Buskirk and Lori A. Van Buskirk (hereinafter the "Plaintiffs"), through their undersigned attorneys, hereby allege as follows:

## I.    PARTIES

1.    Plaintiff Bruce A. Van Buskirk is an individual residing in Cobleskill, New York with an ownership interest in the DCG/UGOC Income Fund, LLC, a North Carolina Limited Liability Company (the "Income Fund").

2.    Plaintiff Lori A. Van Buskirk is the wife of Plaintiff Bruce A. Van Buskirk, a resident of Cobleskill, New York with an ownership interest in the Income Fund.

3.    Defendant DCG Funds Management, LLC ("DCG") is a wholly owned subsidiary of Defendant Davis Capital Group, Inc. ("DAVIS") and a Member of the Income Fund which was organized on June 30, 2008 in the State of North Carolina.  DAVIS is a real estate investment and development firm headquartered in Charlotte, North Carolina.

1

4.       Defendant The United Group of Companies, Inc. ("UGOC") is a real estate investment and development firm headquartered in Troy, New York and a Member of the Income Fund.

5.       Defendant DCG/UGOC Funds Management II, LLC ("Management II") is the Manager of the Income Fund responsible for overall management and administration, including acquisition, management and disposition of the Income Fund assets.  The members of Management II are DCG and UGOC, the latter of which is the Managing Members.

6.       Defendant Richard W. Davis Jr. ("Davis, Jr.") is the Chief Executive Officer and founder of DAVIS, and directed, acted in concert, or aided and abetted in the wrongful acts which caused losses to Plaintiffs as alleged herein.

7.       Defendants Michael J. Uccellini and Jessica F. Steffensen are the duly appointed Executor and Executrix, respectively, of the Estate of Walter F. Uccellini and have been sued in that capacity. Walter F. Uccellini, deceased, was the Chairman and founder of UGOC at all times prior to his death in August 2012 in a plane crash and directed, acted in concert, or aided and abetted in the wrongful acts which caused losses to the Plaintiffs as alleged herein.

8.       Defendant Michael J. Uccellini was the President and Chief Executive Officer of UGOC prior to the death of his father Walter Uccellini and directed, acted in concert, or aided and abetted in the wrongful acts which caused losses to the Plaintiffs as alleged herein.

9.       Defendant MCM Securities, LLC ("MCM") is an SEC-registered broker dealer headquartered in New York City, New York which sponsored and provided supervision and compliance for UGOC and the United Funds and was responsible for monitoring all sales of securities with respect to the United Funds.

10.     Defendant Millennium Credit Markets, LLC ("Millennium") is an investment banking firm which at all times referred to herein was majority owner of MCM and was controlled by UGOC and Walter Uccellini. As such, Millennium directed, acted in concert, and/or aided and abetted in the wrongful acts of MCM as alleged herein.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

12.     Venue is proper in this District Court pursuant to 28 U.S.C. § 1391 in that a substantial part of the events, misrepresentations and omissions giving rise to the claims occurred in this District and certain of the Defendants reside in this District.

## III.     CREATION OF THE FUND SECURITIES

13.     UGOC was founded in 1972 by Walter Uccellini.  During and subsequent to 2008, UGOC and Uccellini represented to the public that, during the history of UGOC, they had developed over $2 billion of real estate projects, acquired more than $500 million in projects, and managed 1.5 million square feet of commercial space and 6,000 residential units.

14.     By 2008, UGOC had developed and was managing through an affiliate senior multi-family communities and had launched plans to develop and manage certain student housing projects near SUNY campuses in Plattsburgh, Brockport, and Cortland, New York.

15.     The financial crisis facing this country in 2008 created serious financial problems for UGOC and for its plans to finance the student housing projects.

16.     As of late 2008, UGOC and Walter Uccellini had been unsuccessful in obtaining bank financing for the projects as well as obtaining funds to cover their own business operations

3

and personal expenses.  During 2008 and 2009, UGOC and Uccellini were desperate for cash and Uccellini was forced to sell his $2 million stake in a country club.

17.     In 2008, UGOC and Walter Uccellini represented to business associates that the pension fund giant TIAA-CREF was prepared to provide UGOC with $50 million of loan financing to develop UGOC projects conditioned upon UGOC first raising $18 million in equity.

18.     In an effort to raise money from individual investors to fund certain of their real estate projects, UGOC, DCG, Management II, Walter Uccellini, Michael Uccellini, DAVIS, and Davis Jr. (hereinafter collectively referred to as the "United Defendants") established two private investment funds, DCG/UGOC Equity Fund, LLC ("Equity Fund") and DCG/UGOC Income Fund, LLC ("Income Fund") (collectively referred to as the "United Funds") in July and August 2008 respectively.

### IV.     TARGETING OF CLIENTS OF PAGEONE FINANCIAL, INC.

19.     In the fall of 2008, Walter Uccellini was introduced to Edgar Page ("Page"), the CEO and Chairman of PageOne Financial, Inc. ("PageOne"), an SEC-registered investment advisor with offices in Malta, New York.

20.     PageOne and its principal Page had long-standing relationships of trust with certain individual investors from New York and surrounding states some of whom had a substantial net worth and each of whom relied upon the advice of Edgar Page in making their investments.

21.     Walter Uccellini told Page of the conditional financing commitment of TIAA-CREF, the United Funds and the UGOC housing projects and requested on behalf of the United Defendants that Page exercise his discretionary control over his clients' accounts to purchase investments in the United Funds.

4

22.   Page was initially prepared to do so, but, upon checking with the designated custodian of client accounts, TD Ameritrade, learned that client investments in private placements such as the United Funds could not be made without obtaining written consent from each investor pursuant to the policy of TD Ameritrade.

23.   At the suggestion of UGOC, Page requested that TD Ameritrade waive the policy, but it refused to do so.

24.   Page indicated to UGOC and Walter Uccellini that he would in the future recommend the United Funds to certain of his clients, but would in the meantime attempt to broker an investment of the $18 million to satisfy the condition of the pending TIAA-CREF loan commitment.

25.   Page sought the investment for UGOC through a bridge loan from Bank of New York Mellon and from HOPE Finance, S.A., but the negotiations were unsuccessful.

26.   On December 15, 2008, Page committed PageOne to purchasing $18.3 million worth of UGOC preferred stock using its clients' assets.  At the same time that Page's commitment was made, UGOC made certain commitments to Page.

27.   Walter Uccellini acting on behalf of UGOC agreed to enter into discussions for the purchase of PageOne from Page on the same terms offered to Page by an independent third party, offered to hire Page as manager of the proposed buyer's assets after the acquisition, and agreed to use the political and business connections of a close business associate to refer to Page for managing over $1 billion of assets from labor unions that would become clients of the acquiring company.

28.     The commitments made to each other by Page and UGOC were never disclosed to any of the clients of PageOne prior to the investments which they approved for their respective securities accounts managed by PageOne.

29.     The United Defendants also agreed to compensate PageOne with the payment of a commission for each sale of United Fund securities sold by Page to any of the clients of PageOne.

30.     As a result, at all relevant times, Page was an agent of the United Defendants acting for the benefit of and at the direction of the United Defendants and the United Funds. Accordingly, the United Defendants are liable for the acts and omissions of Page and PageOne under the principal agency relationship and the doctrine of Respondeat Superior.

31.     Plaintiffs were clients of PageOne residing in Cobbleskill, New York at the time who purchased interests in the Income Fund upon the advice and recommendation of Page and UGOC.

## V.     THE INCOME FUND'S PRIVATE PLACEMENT MEMORANDUM

32.     Effective August 8, 2008, the United Defendants issued a Confidential Private Placement Memorandum ("PPM") for the Income Fund offering for sale $20 million of LLC Membership Interests of $200,000 per investment unit.  The securities were unregistered and offered for sale on a private placement basis under the exemption to section 4(2) of the Securities Act of 1933 and Rule 506 of Regulation D promulgated thereunder.

33.     The investment objective and strategy represented in the PPM was for the Income Fund to invest in (A) securities and debt instruments secured by assets and/or credible guarantors, real estate and real estate related investments, (B)  real estate assets which target existing properties which have achieved stabilized occupancy levels with demonstrated records of distributing cash flow or where cash flows can be significantly enhanced and (C) real estate

property and investments that can be converted to cash during the next five to seven years with targeted annual current rates of returns to the Income Fund of greater than 9%.

34.    All decisions regarding the use and investment of Income Fund assets were to be made by Management II as Manager, by and through DCG and UGOC.

35.    Pursuant to the PPM and the Operating Agreement, the Income Fund would have an initial closing and would commence investment activities once it received $2 million of subscriptions from investors.  Thereafter, the Income Fund would schedule subsequent closings and a final closing when the Income Fund had secured the $20 million in total subscriptions.

36.    The investment period for the Income Fund was to end on the seventh anniversary of the final closing date.  During the investment period, investors were to receive distributions of the net cash flow of the Income Fund not less than semi-annually as follows:

A.    100% to the Members and 0% to Manager represented by a pro rata return of capital contribution plus a return sufficient to realize a 9% internal rate of return until all members have received a complete return of their capital contribution; and

B.    After complete recovery of their capital contributions, members and the Manager would split the net cash flow 80/20, 60/40, and 50/50 in subsequent years respectively with members receiving not less than a 12% to 15% internal rate of return.

## VI.    INVESTMENTS IN THE INCOME FUND

37.    The sale of securities in the Income Fund remained open from 2008 through 2011 and generated capital for the Income Fund in an amount exceeding $15 million.  Approximately $6.6 million in Membership Interests were sold prior to December 31, 2009.

38.    As a result of the economic crisis and UGOC's continuing lack of cash to fund its operations and its projects, the United Defendants improperly and unlawfully elected to use the Income Fund as a bank account to help fund UGOC operations and their struggling projects.

39.     In a February 2009 email from Walter Uccellini to Page, he stated "if we can not have several million dollars collected (in our hands to be spent) by next week, it might very well be necessary to shut down the student housing jobs and then this whole undertaking will have been for naught."  Investors were never informed that UGOC's financial position was this dire. Investor funds were routinely diverted by UGOC from investment in projects as had been represented to investors, and used instead to sustain UGOC's failing operations.

40.     The Income Fund's assets were not invested in securities, real estate assets and/or debt instruments secured by assets, and/or credible guarantors, but rather were used to make unsecured loans to UGOC (exceeding $3.8 million), to Plattsburgh Suites, LLC (exceeding $6.8 million), The Club at Bridge Mill, LLC (exceeding $2.3 million), Cortland Suites, LLC (exceeding $205,000), 400 Jordan Road, LLC (exceeding $290,000), Brockport Suites, LLC (exceeding $119,000) and Colonial Square Associates, LLC (exceeding $380,000).

41.     Each of the entities to which the Income Fund made unsecured loans were parties related to UGOC and under the control of Walter Uccellini and UGOC.  By December 31, 2013, the total notes receivable of the Income Fund from the related parties referred to as debt instruments in the Income Fund financial statements totaled $13,968,929.

42.     These unsecured loans were also used to pay directly or indirectly personal expenses for Walter Uccellini and his family members.

43.     Each of the United Defendants had knowledge of and approved or ratified UGOC's diversion of investor monies in the Income Fund to sustain UGOC operations, pay personal expenses of the Uccellini family, make unsecured loans to related entities, and to make payments to Page for the acquisition of PageOne as hereinafter set forth.

8

44.     Commencing in 2012 and continuing thereafter, a number of the debt instruments held by the Income Fund were in default or entered foreclosure proceedings with primary creditors or bankruptcy which created uncertainty regarding the Income Fund's ability to continue as a going concern.  These foreclosure or bankruptcy proceedings affected the debt instruments in Plattsburgh Suites, LLC, Brockport Suites, LLC, and Cortland Suites, LLC, all of which were student housing projects developed by UGOC and represented to Page and the PageOne investors as the primary investments to be financed using the assets of the United Funds.

## VII.   THE STUDENT HOUSING PROJECTS

45.     In or about 2008, UGOC launched entry into development in the student housing business with plans to finance and construct student housing projects off campus at SUNY campuses in Plattsburgh, Brockport and Cortland, New York.

46.     The Equity Fund invested approximately $11.8 million in purchasing membership interests in the real estate limited liability companies constructing these projects while the Income Fund invested more than $7.1 million in making unsecured loans to these projects.

47.     From the beginning of these projects, there were construction and other problems that rendered these investments highly risky and imprudent.

48.     The $23 million project called the College Suites at Plattsburgh was located next to the SUNY campus.  The project fell behind schedule and opened late in the fall of 2009, missing most of the market for college students in the area.  Thus, the first full year of operation wasn't until the beginning of the 2010-2011 school year at SUNY Plattsburgh.

49.     Occupancy in that first year never reached 70% and continued to fall below projections and representations thereafter.  Furthermore, the housing facility off campus had

nearly 400 beds which was considered by the University too large for the market considering SUNY Plattsburgh had only 5,600 undergraduates and offered plenty of on-campus housing.

50.     Plattsburgh Suites, LLC was in default of its loan agreement and Forbearance Agreement with Key Bank National Association in 2012, was the subject of foreclosure proceedings in 2013 and 2014 for default under its loan and mortgage instruments and filed for bankruptcy in 2015.

51.     The Brockport Suites and Cortland Suites projects faced similar problems from 2010 to 2013 with low occupancy levels and loan defaults which resulted in the filing of foreclosure actions by the lender General Electrical Capital Corporation ("GECC").

52.     On December 10, 2014, the ownership entities for Brockport and Cortland executed deeds in lieu of foreclosure to GECC, thereby extinguishing the investment of the United Funds in these two projects.

### VIII.   PLAINTIFFS' INVESTMENTS IN THE INCOME FUND

53.     In or about August 2010, Page introduced Plaintiff Bruce Van Buskirk to Walter Uccellini and James F. Quinn (UGOC Vice Chairman and in-house counsel) at offices shared by PageOne and UGOC in Rensselaer County, New York within this District.

54.     At the meeting, Page, Walter Uccellini and Quinn explained to Mr. Van Buskirk the investment opportunities with the Equity Fund and Income Fund and provided him copies of the Confidential PPM's for the United Funds.

55.     The United Defendants acting by and through Walter Uccellini and Quinn represented that the United Funds had used and would continue to use Fund assets to invest in the three student housing projects and certain senior housing projects that had been constructed or were in the process of completion; that UGOC and DAVIS were highly experienced in the development, financing, construction and management of such projects; that the projects were a

sound and conservative investment which would generate an internal rate of return of investment of not less than 9% annually and as much as 20-25% or more.

56.     Subsequently, Quinn on behalf of UGOC offered to take Mr. Van Buskirk on a tour of certain of its student housing and senior housing projects so that he could see firsthand how his investment would be used.

57.     In August 2010, Quinn took Mr. Van Buskirk and his son on a tour to inspect Hearthstone Village in Latham, New York, a senior housing facility constructed in 2006 and University Heights College Suites in Albany, New York, a student housing apartment project constructed in 2003 and managed by a UGOC affiliate.

58.     Mr. Van Buskirk was never shown any of the projects in which the United Funds had already invested (including the Plattsburgh, Brockport or Cortland student housing which had been completed but were suffering from occupancy and other problems), but Quinn represented to him that the current projects would be even more successful than the Hearthstone and University Heights projects and would produce an even greater rate of return on investment.

59.     Quinn further represented to Mr. Van Buskirk that UGOC consistently delivered high rates of return on its investments and would do so again with the Income Fund and Equity Fund.

60.     On August 18, 2010, Plaintiffs Bruce A. Van Buskirk and Lori A. Van Buskirk executed Subscription Agreements for the purchase of Membership Interests in the Income Fund for a purchase price of $400,000 (representing 2 units) and $1,340,000 (representing 6.7 units) respectively.

61.     Simultaneous therewith, Plaintiffs each executed the Operating Agreement for the Income Fund and paid the Income Fund $1,740,000.

62.     Part of the payments totaling $740,000 from Lori Van Buskirk were treated as a bridge loan and repaid to her in September 2010, leaving an equity investment of $1,000,000.

## IX.   MISREPRESENTATIONS AND/OR NON-DISCLOSURES TO PLAINTIFFS RELATING TO THE INCOME FUND

63.     In connection with the sale of Membership Interests in the Income Fund to Plaintiffs, the United Defendants and its agent Page made the following representations of fact that were false or misleading as made:

A.     Representing in the PPM and oral communications that the Fund would invest in securities and debt instruments secured by assets and/or credible guarantors, real estate and real estate related assets, when in fact Defendants knew that the Income Fund was almost 100% invested in unsecured notes receivable to affiliate companies controlled by UGOC and in desperation using investor money to continue operations;

B.     Representing in the PPM and oral communications that the Manager was seeking real estate property and corporate real estate investments that could be converted to cash during the next 5 to 7 years, when in fact, the Income Fund had engaged in no such investments and were unable to do so at the time of Plaintiffs' purchases;

C.     Representing in the PPM and oral communications that the Manager was targeting investments for the Income Fund which would generate greater than 9% annual rate of return for investors, when in fact, Defendants knew that the problems encountered with their student housing projects in 2009 and 2010 rendered such rates of return pure speculation and highly unreasonable and that the notes receivable held by the Income Fund were at risk of not being repaid;

D.     Representing that the Income Fund was a sound and conservative investment in August 2010, when in fact UGOC was having serious financial problems

12

and was using fund assets to sustain its operations and the student housing projects were not meeting the necessary occupancy requirements for the represented returns; and

E.      Representing in August 2010 that UGOC's historical performance of delivering successful projects with 7-9% rate of return prior to 2008 was representative of what it would accomplish for investors with the Income Fund.

64.      In connection with the sale of Membership Interests in the Income Fund to Plaintiffs, United Defendants and Page failed to disclose the following facts that were material to the investment and were necessary to render the disclosed facts non-misleading:

A.      That UGOC and its related entities were in serious financial distress and were unable to survive without the investor funds;

B.      That UGOC did not have sufficient capital or bank financing to maintain operations and had used Income Fund assets to cover its operating costs on an unsecured basis;

C.      That the Income Fund under the direction of its Manager controlled by Walter Uccellini had invested close to 100% of its assets in unsecured notes receivable to UGOC affiliated companies;

D.      That the student housing projects at Plattsburgh, Brockport and Cortland which had borrowed more than $7.1 million from the Income Fund had encountered serious financial problems and low occupancy in 2009 and 2010 which created a material risk that the Income Fund's note receivables would not be repaid or would not generate the promised interest rate of return on investment.

E.      That the investments made by the Income Fund to UGOC and related entities prior to August 2010 had been used in part to cover personal expenses of Walter

Uccellini and his family members and that such investments would continue to be used in that manner;

F.    That UGOC and its related entities did not have any procedures in place to assure that investments of the Income Fund would only be used to achieve the Investment Objective and Strategy of the Income Fund – "to generate for its Members stable and durable current yields and, where possible, the potential for longer-term gains."

G.    That the Income Fund regularly renewed unsecured loans to related entities of UGOC and accrued interest income on such loans due at maturity even though the United Defendants failed to assess the credit risk exposure of each borrower entity at the time and determine and report to investors an adequate allowance for credit losses in the Income Fund financial statements.

## X.    DISCLOSURES RELATING TO THE RELATIONSHIP BETWEEN THE UNITED DEFENDANTS AND EDGAR PAGE AND PAGEONE FINANCIAL

65.    In connection with the purchase of their interests in the Fund, Plaintiffs were provided with the PPM for the Income Fund.

66.    All of the United Defendants were involved in the preparation and/or authorization of all disclosures made to investors, including Plaintiffs, in the PPM and in oral communications with Page and any of his clients.

67.    The United Defendants caused the PPM to be sent to Plaintiffs directly or through Page and PageOne, utilizing the mails or interstate wires, at or about the times of the Van Buskirks' investments listed below.

68.    The United Defendants represented in the PPM and elsewhere that UGOC was a nationally recognized firm for the development and management of real property and that it was an industry leader in the student, senior, and multi-family housing development sectors.

14

With regard to the Income Fund, the United Defendants represented that it was intended to generate "stable and durable yields and, where possible, the potential for longer-term gains."

69.     Nowhere in the PPM, the Fund Operating Agreement attached to the PPM, or any other document provided to the Van Buskirks in connection with their investment in the Fund did the United Defendants make any disclosures concerning any financial arrangements between UGOC on one hand, and Page and PageOne on the other hand, or that any of the assets of the United Funds had been used and would continue to be used to pay Page for the proposed acquisition of PageOne by UGOC.

70.     With regard to compensation, the PPM included only a general representation as to compensation of Placement Agents (along with a materially similar representation in the Fund Operating Agreement):

> The Manager may retain placement agents (the "Placement Agents") to assist in the private placement of Interests in the Fund. The Fund will be responsible for paying the placement agent fees of the Placement Agent (the "Placement Agent Fees"). Investors solicited by such persons will be advised of, and asked to consent to, any such compensation arrangement. In addition, the Placement Agents may, from time to time and in their sole discretion, waive all or part of the Placement Agent Fees in respect of certain other investors.

71.     The only disclosures even remotely touching upon financial arrangements between UGOC and PageOne were set out in Forms ADV that Page and PageOne filed with the SEC and posted on the PageOne website. The Form ADV dated July 31, 2009 contained a vague, general disclosure with respect to United:

> Fee schedule: PageOne Financial does not directly charge the client a fee for this service. PageOne Financial is compensated by a referral fee paid by the Manager of the Private Fund(s) in which its clients invest. The management and other fees the client pays to the Private Funds are not increased as a result of Registrant's referral of clients to the Private Funds. PageOne Financial will typically receive, on an annual basis, a referral fee of between

7.0% and 0.75% of the amount invested by the client in the applicable Private Fund(s). (Cease & Desist Order at ¶ 21[1])

72.     Page and PageOne amended even this vague disclosure, omitting the reference to the percentage range of referral fees and instead making a general statement about compensation as a consultant. The Form ADV dated September 14, 2010, stated as follows:

> Edgar R. Page, Chairman and Chief Financial Officer of PageOne Financial, is also employed as a consultant to The United Group of Companies, Inc. ("UGOC"). UGOC is a real estate investment and development firm. Mr. Page is compensated for the consulting services he provides to UGOC. As disclosed above, PageOne Financial recommends private funds that are managed by UGOC to PageOne's advisory clients for which PageOne receives an advisor fee. Advisory clients are under no obligation to participate in such investments. (Cease and Desist Order at ¶ 27.)

73.     Remarkably, Page and PageOne went still further when, on March 1, 2011, they amended the Form ADV to remove all references to UGOC and the United Funds.

74.     After the Van Buskirks became investors in the Fund in August 2010, the Defendants caused the Fund to send statements, letters and other correspondence to the Van Buskirks, not one of which included any further disclosure of any financial arrangements with Page and PageOne.

## XI.    SEC PROCEEDINGS

75.     Several years after the Plaintiffs made the investment, a United States Securities and Exchange Commission ("SEC") proceeding against Page and PageOne revealed that UGOC had procured Plaintiffs' investment through fraudulent misrepresentations and omissions, and fraudulent acts and devices. The SEC Proceeding revealed that UGOC had secretly agreed purchase PageOne from Page in exchange for Page directing his clients to use their assets to

---

[1] August 26, 2014 Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e), 203(f), and 203(k) of the Investment Advisors Act of 1940 and Sections 9(b) of the Investment Company Act of 1940, *In the Matter of Edgar R. Page and PageOne Financial Inc*., SEC Administrative Proceeding, File No. 3-16037 (hereinafter referred to as "Cease and Desist Order").

invest in the United Funds. The SEC Proceeding also revealed that UGOC had used investor money in the United Funds to make payments to Page in connection with the PageOne purchase agreement. On August 26, 2014, the SEC instituted administrative and cease-and-desist proceedings pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 and Section 9(b) of the Investment Company Act of 1940 against Page and PageOne.

76.    On March 10, 2015, following the submission by Page and PageOne of an Offer of Settlement, the SEC issued an Order Making Findings in the SEC Proceeding ("Findings Order[2]") The SEC Findings resolved the liability portion of the administrative proceeding, which concluded that Page and PageOne had "willfully violated Sections 206(1) and 206(2) of the [Investment Advisers Act of 1940], which prohibit fraudulent conduct by an investment adviser[,]" (Findings Order ¶ 40), as well as Section 207 of the Advisers Act "which makes it 'unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission . . . or willfully to omit to state in any such application or report any material fact which is required to be stated therein.'" (Findings Order ¶¶ 41, 42b.)

77.    The SEC Proceeding revealed that Page and PageOne failed to disclose conflicts of interest in connection with the solicitation of investments for the UGOC.

78.    The undisclosed conflict of interest centered on UGOC's incentivizing of Page and PageOne to raise capital for the United Funds, through offers to acquire PageOne.

---

[2] March 10, 2015 Order Making Findings Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Sections 203(e), 203(f), and 203(k) of the Investment Advisors Act of 1940 and Section 9(b) of the Investment Company Act of 1940, and Ordering Continuation of Proceedings, *In the Matter of Edgar R. Page and PageOne Financial Inc.*, SEC Administrative Proceeding, File No. 3-16037 (hereinafter referred to as "Findings Order").

79.    The SEC proceeding in its Cease & Desist Order also revealed that in late 2008, Page entered into an agreement with UGOC whereby UGOC would acquire PageOne which encompassed the following:

A.    UGOC would pay approximately $3 million, to be paid in installments over time.

B.    The acquisition would not close, and UGOC would not make the final payments of the purchase price, until Page raised approximately $20 million for UGOC's funds.

80.    The SEC proceeding also determined the following facts set forth in paragraphs 81 through 84 herein.

81.    Sometime prior to April 2010, Page and UGOC agreed to revised terms, whereby UGOC would acquire 49% of PageOne for approximately $2.4 million, a figure that was later increased to approximately $3 million.

82.    Page had begun recommending the UGOC funds to his clients beginning in early 2009.  Between March 2009 and September 2011, the clients of Page and PageOne invested between approximately $13 million and $15 million in the UGOC funds.

83.    Over roughly this same time period, UGOC made installment payments on the acquisition of approximately $2.7 million. UGOC made these payments directly to Page, PageOne and other entities and persons, at Page's direction.

84.    The approximately $2.7 million in payments by UGOC represented approximately 18% of PageOne's clients' investments in the UGOC funds.

85.    Critically, Defendants knew that the funds Page was raising were necessary to fund the UGOC's installment payments. As explained by the SEC in its findings,

Page and PageOne knew (or recklessly disregarded) that the timing of [UGOC's] acquisition payments – which often followed very closely in time behind PageOne clients' investments in the [United funds] – was linked to those investments. First, Respondents had explicitly agreed to raise money for the [United funds] as a term of the acquisition. Thus, on at least one occasion, E. Page emailed [UGOC's] founder and Chairman (the "Chairman") to notify him that a PageOne client had invested in the Private Funds and to ask for an acquisition payment. Moreover, E. Page understood that the Chairman and [UGOC] did not have sufficient liquidity of their own to complete the acquisition of PageOne. Indeed, E. Page understood that the Chairman was, at the time, selling certain personal assets to keep [UGOC's] business going. (Findings Order ¶ 15)

86.    As further explained by the SEC, during the time period that UGOC was making the installment payments, Page was personally liable on promissory notes to repay the installment payments if the UGOC acquisition did not close:

The acquisition payments were memorialized as promissory notes from E. Page to [UGOC]. E. Page understood, from the Chairman, that – in the event that the acquisition was consummated – the [UGOC] would cancel the notes. However, he likewise understood that until the acquisition closed and [UGOC] cancelled the notes, E. Page was personally liable for the notes. Indeed, E. Page expressed just this concern to the Chairman, writing in an email in January 2010 that, as a result of the acquisition not closing, "I have a large loan 'lliability' [sic] and no assets." (Findings Order ¶ 16.)

87.    The UGOC knowingly utilized Page and PageOne to continue to raise capital.

Over the course of 2010 and 2011, E. Page became increasingly concerned that the acquisition would not close. He understood that he had not been able to raise the $20 million, a condition precedent for the acquisition. And, he knew or recklessly disregarded that [UGOG] had not been able to otherwise raise sufficient funds to pay the balance on the acquisition price. In both 2010 and 2011, the Chairman made increasingly urgent appeals to E. Page to assist [UGOC] in fund-raising, for example, telling him of his "need" to raise money and saying that he "desperately need[ed]" E. Page's help in doing so. (Findings Order ¶ 36 (emphasis supplied).)

88.    Particularly notable is the timing of the Plaintiffs' investments in the Fund. As explained above, the Plaintiffs made their investments in the Income Fund in response to UGOC and Page's multiple solicitations from in August 2010 at the same time the United Defendants were desperately seeking additional funds to keep their undisclosed acquisition scheme going.

## XII.   FRAUDULENT SCHEME OF THE DEFENDANTS

89.     The United Defendants knowingly and recklessly engaged in the scheme to lure investors, including the Van Buskirks, into the Fund, using Page and PageOne as their agent and alter ego, through material false statements and omissions and fraudulent acts and devices, relating to the Income Fund and relating to the undisclosed business relationship with Page and PageOne.

90.     As explained above, neither the United Defendants nor Page disclosed any facts to the Van Buskirks concerning the financial arrangement between UGOC, PageOne and Page, nor disclosed any of the material facts concerning the Income Fund as alleged in paragraph 64. With particular respect the acquisition of PageOne, the United Defendants falsely stated, with regard to Private Placement Agent fees, "Investors solicited by such persons will be advised of, and asked to consent to, any such compensation arrangement."

91.     In fact, the United Defendants knowingly concealed material facts, including, but not limited to the fact that (i) UGOC had entered into an agreement to acquire PageOne; (ii) UGOC had already made substantial installment payments pursuant to the acquisition agreement; (iii) UGOC and UCFM were utilizing proceeds of Page's and PageOne's clients' investments to fund the on-going installment payments; (iv) in the absence of the proceeds of Page's and PageOne's clients' investments, UGOC lacked funds to make the installment payments; (v) Page and PageOne faced massive financial liability if the acquisition did not close, and (vi) each of the misrepresentations and omissions specifically alleged in paragraphs 63 and 64 herein.

92.     The United Defendants also knew that neither Page nor PageOne had disclosed any of the facts concerning the financial arrangement in the Forms ADV, or otherwise, or recklessly regarded such non-disclosure.

20

93.     The United Defendants knew that the disclosures to the Plaintiffs in the Forms ADV, the PPM, other documentation, and oral communications with UGOC and Page provided in connection with their investments in the Income Fund were false or made in reckless disregard of their truth or falsity and omitted to disclose material facts that were necessary to make the statements made non misleading.

94.     The United Defendants were also aware of the timing of Plaintiffs' investments (by virtue of their receipt of documentation and ultimately the proceeds associated with Plaintiffs' investments) and actively utilized Page and PageOne to continue to raise money for their own benefit and to fund the installment payments to Page and PageOne.

95.     The United Defendants had a motive to continue the fraudulent solicitation of investors such as the Van Buskirks through the false and misleading disclosures, in that, among other things, (i) they needed cash to fund the installment payments under the acquisition agreement; (ii) they needed cash to fund intended investments in real estate ventures in which the United Defendants intended to participate, and from which the United Defendants stood to profit on both the investments and management and other fees; and (iii) the investments in the Fund would generate additional management and other fees for the United Defendants.

## XIII.   DAMAGES SUFFERED BY THE PLAINTIFFS

96.     But for the false and misleading representations, statements and omissions alleged herein, Plaintiffs would not have invested in the Income Fund.

97.     In the initial decision of the SEC dated June 25, 2015, ALJ Patil found, "Page recommended investments with a high degree of risk, and Page's clients ran the risk of substantial losses." ALJ Patil further found:

> While [Page and PageOne] are correct that the poor performance of the [United] Funds
> is not at least exclusively their fault, it is certainly their fault that their clients were that
> their clients were recruited to invest in the [United] Funds under false pretenses and

21

without upfront disclosure of a significant conflict of interest. . . . Further, Page acknowledged that making a full and complete disclosure of the conflict of interest - including that he was working on selling at least some of PageOne while routing funds to the buyer – would have made clients "extremely nervous" and would be "too dangerous" – presumably because the clients would no longer want to do business with [Page and PageOne]. . . . (Initial Decision[3] at 5 [citations omitted]).

98.     Not only are Plaintiffs stuck with an investment they would not have chosen had they known the truth, but their funds are now locked up under the control of the United Defendants, who have refused to release them. Under the terms of the operating agreement governing the Fund, Plaintiffs are unable to liquidate their investment without the approval of the United Defendants.

99.     In fact, Plaintiffs' investments in the Fund constitute the vast majority of their available investment funds.

100.    Indeed, prior to commencing this action, the Plaintiffs demanded a refund of their investments in the Fund, together with all accrued dividends and interest. The United Defendants refused to return any of Plaintiffs' funds.

101.    Plaintiffs' investment in the fund was procured through unlawful conduct and is subject to rescission and/or recovery of monetary damages.

102.    Plaintiffs bring these claims within six years from the date of the wrongful acts and within two years of the date of discovery of Defendants' fraud through the exercise of reasonable diligence.

---

[3] June 25, 2015 Initial Decision, *In the Matter of Edgar R. Page and PageOne Financial Inc*., SEC Administrative Proceeding, File No. 3-16037 (hereinafter referred to as the "Initial Decision").

## First Cause Of Action –
## (Common Law Fraud – the United Defendants)

103.    Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

104.    The United Defendants made each of the misrepresentations of fact specifically set forth in paragraph 63 of this Complaint through the PPM to the Income Fund and/or in verbal communications with Plaintiff Bruce Van Buskirk as alleged herein.

105.    Each of said representations when made at the time of sale in August and September 2010 were knowingly false when made or misleading without disclosure of the facts specifically alleged in paragraphs 64, 27-28, and 91 of the Complaint.

106.    The United Defendants omitted to disclose to Plaintiffs the facts set forth in paragraphs 64, 27-28, and 91 of the Complaint.

107.    Each of the representations of fact and the omissions to disclose were material information necessary for an investor to determine whether or not to purchase such securities.

108.    The United Defendants knew that the representations were untrue and that the omissions were material information to an investor necessary to make at least certain of the representations non-misleading, or the United Defendants acted under circumstances of recklessness.

109.    The misrepresentations and omissions were made by the United Defendants to deceive Plaintiffs and for the purpose of causing Plaintiffs to make investments in the Income Fund securities.

110.    Plaintiffs justifiably and reasonably relied upon the misrepresentations and omissions of the United Defendants.

111.     As a proximate result thereof, Plaintiffs were damaged in an amount exceeding $1,000,000 plus interest.

112.     The misrepresentations and omissions of the United Defendants were willful, wanton and malicious and Plaintiffs should be awarded their reasonable attorney fees and punitive damages.

## Second Cause Of Action –
## (Breach of Fiduciary Duty and/or Aiding and Abetting in a Breach of Fiduciary Duty – the United Defendants)

113.     Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

114.     PageOne and Page had a fiduciary relationship with Plaintiffs, their clients, involving a special trust, confidence and reliance on the fiduciaries to exercise their discretion and expertise for recommending the purchase and sale of securities for their investment accounts.

115.     PageOne and Page as fiduciaries were forbidden from acting in any manner adverse or contrary to the interests of Plaintiffs or from acting for their own benefit or the benefit of others in relation to the purchase of investments for Plaintiffs' accounts.

116.     The United Defendants. had knowledge of the fiduciary relationship between PageOne and Page on the one hand and Plaintiffs on the other hand and directed their agents PageOne and Page to breach their duty of loyalty and their duty of prudence to Plaintiffs by causing them to purchase Membership Interests in the Income Fund based on misrepresentations of material fact contained in the PPM and in oral communications as alleged herein and by omitting to disclose material facts necessary to make the representations non-misleading as alleged herein.

117.   By reason of the relationship of respondent superior or principal and agent by and between the United Defendants and PageOne and Page as alleged herein, the United Defendants also had a fiduciary relationship with Plaintiffs.

118.   The United Defendants breached their duty of loyalty and duty of prudence to Plaintiffs by the false representations of material facts, and by the omissions to disclose material facts, as alleged herein, that were made to Plaintiffs by UGOC and Page.

119.   Alternatively, the United Defendants aided and abetted Page and PageOne in making false representations and omissions which breached the fiduciary duties of Page and PageOne to Plaintiffs.

120.   As a proximate result of the breaches of fiduciary duty, Plaintiffs have been damaged in a sum exceeding $1,500,000.

121.   The actions of the United Defendants were willful, wanton and malicious, and Plaintiffs are entitled to recover their reasonable attorney fees and punitive damages.

### Third Cause Of Action –
### (Negligent Misrepresentation – the United Defendants)

122.   Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

123.   In the sale of securities to Plaintiffs, the United Defendants had a duty to disclose all material information necessary for investors such as Plaintiffs to determine whether or not to purchase security interests in the Income Fund.

124.   The United Defendants and their agent Page made each of the misrepresentations of fact specifically set forth in paragraph 63 of this Complaint and omitted to disclose to Plaintiffs each of the material facts set forth in paragraphs 64, 27-28, and 91 of the Complaint.

125. Each of said misrepresentations and omissions of material fact were negligently and recklessly made by the United Defendants through the PPM and oral communications as alleged herein and/or made by and through Page, as agent for the United Defendants.

126. The United Defendants knew or should have known that the misrepresentations and omissions were negligently and recklessly made to Plaintiffs and would deceive Plaintiffs and cause them to make investments in the Income Fund securities.

127. Each of the misrepresentations and omissions to disclose were material to the decision of Plaintiffs to purchase interests in the Income Fund.

128. Plaintiffs justifiably and reasonably relied upon the negligent and reckless misrepresentations and omissions.

129. As a proximate result thereof, Plaintiffs were damaged in an amount exceeding $1,500,000 plus interest.

## Fourth Cause Of Action –
## (Unjust Enrichment – the United Defendants)

130. The United Defendants benefitted from the misrepresentations and omissions alleged herein and the purchase of interests in the Income Fund by Plaintiffs.

131. The financial benefits received by the United Defendants were detrimental to and at the expense of Plaintiffs who innocently relied upon the misrepresentations and omissions made by the United Defendants and their agent.

132. As a proximate result thereof, the United Defendants have been unjustly enriched and equity and good conscience require that the Court order restitution of the losses sustained by Plaintiffs from their investment in the Income Fund.

## Fifth Cause Of Action –
## (Aiding and Abetting – the MCM Defendants)

133.    Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

134.    MCM, as a registered broker-dealer under Section 15(b) of the Securities Exchange Act, sponsored UGOC and DCG with respect to their sale of securities and provided back office support, compliance and supervisory services and trading capability for the securities which they promoted and sold.

135.    Pursuant to applicable law and security regulations, MCM was required as a broker-dealer to have written supervisory procedures and a reasonably designed program in place to prevent and detect violations of the securities laws and FINRA rules.

136.    Upon information and belief, UGOC's office in Troy, New York was at all times referred to herein as a branch office of MCM which was responsible to conduct supervision to assure that UGOC and DCG salesmen and sales agents complied with any and all legal and regulatory obligations.

137.    Defendants UGOC and DCG committed numerous legal and regulatory violations of the securities laws and FINRA regulations by selling unsuitable securities in the Income Fund to Plaintiffs and other investors by and through UGOC sales representatives and through its sales agent Edgar Page and by making the misrepresentations and omissions alleged herein.

138.    Because MCM was controlled by Millennium and the latter entity controlled by Uccellini, Uccellini directed MCM to refrain from performing compliance and supervisory activity regarding sale of securities in the Income Fund during the period of time in 2010 when Plaintiffs purchased their Membership Interests.

139.    Indeed, the acts of Uccellini through his control of MCM resulted in a complete institutional failure by MCM to provide the necessary training, expertise, oversight and/or back office support to UGOC and DCG necessary to properly supervise and manage the sale of securities for projects promoted by UGOC and DCG.

140.    MCM and Millennium acting in concert with Uccellini permitted a misleading PPM to be distributed to Plaintiff and other investors in 2010, permitted omissions of material fact alleged herein to be made to Plaintiff and other investors, failed to determine the suitability of investments in the Income Fund by Plaintiff and other investors, failed to determine whether purchasers were accredited investors, failed to provide any meaningful monitoring of such sales and failed to properly manage the sales representatives of UGOC and DCG.

141.    The acts of disregarding their supervisory and compliance duties in connection with the sale of the Income Fund in 2010 were intentional and intended to deceive Plaintiffs for the purpose of causing them to purchase security interests in the Income Fund based on material misrepresentations and omissions.

142.    Plaintiffs justifiably and reasonably relied upon the misrepresentations and omissions and reasonably believed that all acts of Defendants were performed in accordance with applicable law and security regulations.

143.    As a proximate result thereof, Plaintiffs have been damaged in an amount exceeding $1,500,000 plus interest.

144.    The acts of MCM, Millennium, and Uccellini (the "MCM Defendants") were willful, wanton and malicious and Plaintiffs should be awarded their reasonable attorney fees and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand:

A.        As to the First Cause of Action, that judgment be granted in favor of Plaintiffs and against the United Defendants, jointly and severally, for rescission of Plaintiffs' investment plus pre-judgment interest or, in the alternative, monetary damages in an amount to be determined at trial plus pre-judgment interest;

B.        As to the Second Cause of Action, that judgment be granted in favor of Plaintiffs and against the United Defendants, jointly and severally, in an amount as determined at trial plus prejudgment interest;

C.        As to the Third Cause of Action, that judgment be granted in favor of Plaintiffs and against the United Defendants, jointly and severally, in an amount as determined at trial plus prejudgment interest;

D.        As to the Fourth Cause of Action, that judgment be granted in favor of Plaintiffs and against the United Defendants, jointly and severally, in an amount as determined at trial plus prejudgment interest;

E.        As to the Fifth Cause of Action, that judgment be granted in favor of Plaintiffs and against the MCM Defendants, jointly and severally, in an amount as determined at trial plus prejudgment interest;

F.        That Plaintiffs be awarded punitive damages in an amount not less than $1,500,000;

G.        That Plaintiffs be awarded their reasonable attorney fees, post-judgment interest and cost of suit; and

29

H.     That Plaintiffs be awarded such further relief, legal or equitable, as the court may

deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial on all issues so triable.

DATED:  Albany, New York
             August 29, 2016

DEVINE, SNYDER & BRUNO, LLP


By *s/Terence J. Devine*_____
Terence J. Devine
tdevine@dsblawyers.com
52 CORPORATE CIRCLE, SUITE 207
ALBANY, NY 12203
TELEPHONE: (518) 464-0640


By *s/Gary A. Gotto*_____
     *s/Gary D. Greenwald*_____
KELLER ROHRBACK, LLP
Gary A. Gotto *(pro hac vice forthcoming)*
Gary D. Greenwald *(pro hac vice forthcoming)*
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822
ggotto@kellerrohrback.com
ggreenwald@kellerrohrback.com

By *s/David J. Ko*_____
David J. Ko *(pro hac vice forthcoming)*
1201 Third Avenue, Suite 3200
Seattle, WA 98109
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
dko@kellerrohrback.com

***Attorneys for Plaintiff***